```
 1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MARYLAND
 2                        Greenbelt Division

 3  UNITED STATES OF AMERICA,      :     Docket No. 13-CR-0149-CBD1

 4       Plaintiff,                :
                                         Greenbelt, Maryland
 5          v.                     :     Wednesday, June 19, 2013
                                         2:35 p.m.
 6  KIRK YAMATANI,                 :

 7       Defendant                 :

 8  : : : : : : : : : : : : : : : : : : : : : : : : : : : : : :

 9

10                   TRANSCRIPT OF SENTENCING HEARING
                  BEFORE THE HONORABLE CHARLES B. DAY,
11                   UNITED STATES MAGISTRATE JUDGE

12
    APPEARANCES:
13
    For the United States       United States Attorney's Office
14  of America:                 BY:  ADAM K. AKE, AUSA
                                      ROBERT K. HUR, AUSA
15                              6500 Cherrywood Lane, Suite 400
                                Greenbelt, Maryland  20770
16

17  Audio Operator:             CAMILLE HATCHER

18

19  Transcript prepared by:     JANICE RUSSELL TRANSCRIPTS
                                1133 Tanager Trail
20                              Virginia Beach, Virginia  23451
                                (757) 422-9089
21                              trussell31@cox.net

22
    Proceedings recorded by electronic sound recording; transcript
23  produced by transcription service.

24

25
```

```
 1   APPEARANCES (Continued):

 2   For Defendant, Kirk          STEVEN H. LEVIN, ESQ.
     Yamatani:                    250 W. Pratt St., Suite 1300
 3                                Baltimore, Maryland  21201

 4
     ALSO PRESENT:                R. CURT VAUGHAN, Investigator
 5                                Office of Inspector General
                                  Department of Commerce
 6

 7                                ERIC HATHAWAY, Investigator
                                  Federal Bureau of Investigation
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       P R O C E E D I N G S

2               MR. LEVIN:  Good afternoon, your Honor.

3               THE COURT:  Good afternoon.  Welcome all.

4               MR. AKE:  Good afternoon, your Honor.

5               Your Honor, I, I think we had a question.  Just

6    procedurally, do you want to do these serially, or do you wish

7    to do them at the same time as our allocutions and

8    recommendations as to both defendants are going to be --

9               THE COURT:  One at a time.

10              MR. AKE:  -- essentially the same.  Okay.  Yes, your

11   Honor.

12              THE COURT:  Okay.  Thank you.

13              THE COURTROOM DEPUTY:  The matter coming before this

14   Court is United States of America versus Kirk Yamatani and

15   Criminal Action No. 13-CR-0149-CBD.  We are here for a

16   sentencing hearing.

17              Will counsel please identify themselves for the

18   record?

19              MR. AKE:  Good afternoon, your Honor.  Adam Ake and

20   Robert Hur for the United States.  We're also joined in the

21   courtroom by investigating agents, Special Agent Eric Hathaway

22   of the FBI and Investigator Curt Vaughan from the Department of

23   Commerce Inspector General's Office.

24              THE COURT:  Thank you.  Welcome.

25              MR. LEVIN:  Good afternoon, your Honor.  Steven Levin

1    on behalf of Mr. Yamatani and Mr. Yamatani is seated to my

2    left.

3              THE COURT:  Thank you.  Welcome all.

4              Give me just a moment.

5       (Pause)

6              THE COURT:  I trust that both parties have received

7    copies of the pre-sentence report, is that correct?

8              MR. AKE:  Yes, your Honor.

9              MR. LEVIN:  Yes, your Honor

10             THE COURT:  Any modifications or corrections?

11             MR. AKE:  No, your Honor.

12             THE COURT:  Okay.

13             Since this matter comes to me by way of a guilty plea,

14    I'll hear first from the defense, then I'll hear from counsel

15    for the Government, and then I'll give Mr. Yamatani final

16    opportunity to speak.

17             Counsel.

18             MR. LEVIN:  Thank you, your Honor.

19             I, I would point out that, that the first page of the

20    pre-sentence report indicates that the report was prepared for

21    the Honorable C. Bruce Anderson.

22             THE COURT:  Yes.

23             MR. LEVIN:  I just didn't want you to get short

24    shrift, your Honor --

25             THE COURT:  Oh.

1        MR. LEVIN:   -- so.

2        THE COURT:  It's all right.

3        MR. LEVIN:  May I stand to the podium?

4        THE COURT:  By all means.

5        MR. LEVIN:  Thank you.

6        Your Honor, today is, obviously, a very difficult day.

7   My understanding from conversations with Judges is that

8   sentencing is, perhaps, the most difficult aspect of, of your

9   position.  I would imagine your Honor's no different in that

10  regard.  It's a difficult day for Mr. Yamatani as well.  Even

11  before walking into this courtroom, your Honor, Mr. Yamatani --

12  and I'm, I'm so used to having previously referred to him as,

13  as Special Agent Yamatani -- but now Mr. Yamatani has lost so

14  much.  He lost his career.  He lost his reputation.  He lost a

15  great deal of money.  He's lost his future retirement from

16  Government service and today when Mr. Yamatani leaves this

17  courtroom he will have lost a little bit more and that is a

18  certain degree of his liberties will have been taken away from

19  him and that is a reference to probation, your Honor.

20       The Government believes probation's appropriate, the

21  probation officer believes probation is appropriate, and,

22  frankly, your Honor, Mr. Yamatani agreed in his plea agreement

23  and we agreed that probation is appropriate.  Really, the only

24  issue is whether or not Mr. Yamatani needs to be punished even

25  further with any imposition of home detention.  And, and,

1   really, that's what I want to focus on, your Honor, because I

2   want to bring to the Court's attention some collateral

3   consequences of home detention that, in all fairness to the

4   Government, I just don't think, I know they're recommending

5   home detention and I don't think they're aware of some of these

6   collateral consequences that would result.

7          And really, if you think about what, what's the

8   purpose of home detention, it's, it's either deterrence or

9   punishment, or both.  I don't think anyone believes that

10  Mr. Yamatani needs to be further deterred with all of the other

11  things he has lost and our position is that he doesn't need to

12  be further punished and home detention would be a sentence, an

13  imposition that is greater than necessary to achieve justice.

14         Your Honor, because of this situation which

15  Mr. Yamatani has acknowledged he, he caused for himself and,

16  and his family, Mrs. Yamatani had to go back to work.  Prior to

17  that, she was caring for their 8-year-old daughter and 7, now

18  7-year-old son, but because of this situation and the loss of,

19  of income, Mr., Mrs. Yamatani has gone back to work in an

20  effort to make some money.  I'm sure your Honor read the pre-

21  sentence report carefully and, and saw that they now have a

22  negative monthly cash flow and even with Mrs. Yamatani working

23  that remains the case.

24         So Mrs. Yamatani is working.  Mr. Yamatani is now the

25  primary caretaker for the two children and just to demonstrate

1    how, how much of a, how much of an impact home detention would

2    have on the, on the family, the next few months, looking at

3    just this summer, your Honor, the Yamatani children have plans

4    to attend various camps for kids.  They have gymnastics,

5    soccer.  They have a Bible camp later this month and because

6    Mrs. Yamatani is working it would fall on Mr. Yamatani to take

7    the children to the camps and pick them up from the camps.  It

8    would cause a great deal of, of chaos, both financial and

9    emotional chaos if Mr. Yamatani could not take the children to

10   camp.  It's really punishing the children for what Mr. Yamatani

11   has done.

12          And going beyond that, when school starts in August

13   the children do not have bus transportation.  Even though they

14   attend public school, because of their location they can't rely

15   on public transportation.  And so, again, it would fall on

16   Mr. Yamatani to take the children to school at approximately

17   7:30 and pick them up daily at approximately 2:30, plus as

18   children get sick it would fall on Mr. Yamatani to take the

19   children to various medical appointments as well as after-

20   school activities.

21          So while the family is trying to recoup from all the

22   financial losses here, it would just be much more difficult if

23   Mr. Yamatani isn't given the liberty to care for his family on

24   a day-to-day basis, your Honor.

25          At the same time, Mr. Yamatani is trying to contribute

1   financially to his family and so he's trying to, to rebuild a

2   business.  I think the pre-sentence report discusses a, an

3   Atlanta-based studio business that Mr. Yamatani started several

4   years ago.  He continues to try to make some money doing that

5   and, perhaps, expand it and that's going to require a great

6   deal of, of time meeting with potential investors and clients

7   and again, home detention would just sink the Yamatani family

8   into a greater hole.  That's really just simply greater than

9   necessary in light of the, of the fine he's agreed to pay, the

10  restitution he's agreed to pay, the fact that he, he did

11  resign, giving up a career and a potential retirement.

12          Your Honor, they're trying to stay in their home.  The

13  situation has made it very difficult.  Home detention would

14  likely make that impossible.

15          Mr. Yamatani is trying to save his marriage and that

16  may be extremely difficult if he's at home making it more

17  burdensome for Mrs. Yamatani to take care of the children, the

18  house, the finances basically on her own.

19          So you can imagine, one can imagine the resentment

20  that would be created there.

21          Your Honor, in light of that, we would ask that

22  probation, straight probation, while appropriate, is also all

23  that is necessary in this particular case.

24          Thank you, your Honor.

25          THE COURT:  Thank you.

1            MR. AKE:  Your Honor, the Government is recommending,

2   and consistent with what Probation recommended, we're

3   recommending that the Court impose a sentence of two years

4   probation with a six-month home detention component, although

5   the Court is certainly free to defer that for a few months

6   until the end of the summer if the Court's swayed by the

7   defendant's arguments about the, the hardship that that would

8   place on the, the minor children in the household before school

9   started back up.

10           The Government's also recommending that the Court

11  impose the agreed-upon restitution of $14,000 and fine of

12  $28,000.

13           The recommendation that probation only be two years is

14  somewhat contingent, your Honor, on, on the time, time limits

15  of the defendant's satisfaction of the financial aspects of

16  the, the sentence imposed.

17           So in the plea agreement the defendants had agreed to

18  a longer term of probation if the Court allowed a payment

19  schedule, for instance, but so long as they make all the

20  payments within that two-year period the Government's satisfied

21  that its interests are vindicated in terms of the financial

22  aspects.

23           What, what we don't want to happen is that probation

24  expires while there's still outstanding monies to be paid, or

25  financial aspects of the judgment that hadn't yet been

1    satisfied and that the Government then loses its ability to use

2    the, the fact that the defendant is still on probation and the

3    threat of a violation of probation to help compel those

4    payments.  But as long as the Court imposes, or it makes clear

5    that the financial aspects are to be payable immediately or

6    within one month, as Probation is recommending, and as long as

7    the, the defendant satisfies that, the Government feels that

8    two years probation is adequate, but not greater than necessary

9    to reflect the seriousness of the offense.

10            Now turning to the, the one year that's really, as, as

11   between the two parties before you, at issue is the length of

12   any home detention aspect of probation the Court may impose

13   here.  I'd really ask the Court to weigh heavily the first two

14   aspects of 3553(a) and those are really the nature and

15   circumstances of the offense and the history and

16   characteristics of the defendant and the need for the sentence

17   imposed to reflect the seriousness of the offense.

18            Now here, clearly, the, the defendant appears before

19   this Court in a much different position that most defendants

20   that appear for federal sentencing in that he has an

21   unblemished criminal history, but it's really the fact that the

22   defendant occupied a significant position of trust within the

23   Government and was employed as a, a law enforcement officer

24   that makes this offense much more serious than, perhaps, the,

25   the financial totals involved would counsel at first blush.

1   It's, it's because the defendant was a special agent and was

2   tasked with investigating, in part, some of the crimes that he

3   engaged in, time and attendance fraud, travel voucher fraud,

4   within his agency and then committed those acts himself that it

5   really makes this a significant offense and makes the

6   Government so interested in, in seeking prosecution for that

7   act.  And then in deterring others who are also law

8   enforcement, that even if they, if they stray from the straight

9   and narrow, that that's going to result in pretty significant

10  consequences and not just in the loss of a job, but also in a

11  potential loss of liberty and we think that weighing all those

12  factors between the seriousness of the offense and the need to

13  keep other law enforcement agents on their, in their, you know,

14  in the, in the mindset that they're going to be held to a

15  higher standard does counsel for some restriction on

16  Mr. Yamatani's freedom and probation by itself, while it does

17  require close coordination with a supervising probation officer

18  and, you know, making periodic reports and occasionally having

19  meetings, that doesn't impose nearly the same restriction on

20  liberty that the period of home confinement would.  But, on the

21  other hand, that, in turn, is nowhere near the restriction on

22  one's liberty that a period of incarceration would entail.

23          So I think it does strike the balance.  A limited

24  period of home detention of six months does strike the balance

25  between recognizing that the defendant doesn't have a criminal

```
1   history, that he is a first-time offender, but at the same time

2   that this is very serious because of the position he occupied

3   within the Government within his agency.

4           So the Government feels that that is the perfect

5   disposition in this case.  We'd ask the Court to impose that

6   sentence as part of the period of probation that it does

7   impose, assuming that that's what the Court's going to impose.

8           Does the Court have any questions for the Government,

9   your Honor?

10          THE COURT:  No.

11          MR. AKE:  Okay.  Thank you, your Honor.

12          THE COURT:  Thank you.

13          Mr. Yamatani, before I impose the disposition, you

14  have the right to say anything you wish to say, but before

15  doing so I'm going to ask you to stand and raise your right

16  hand.  We're going to place you under oath.

17      (Defendant Yamatani sworn)

18          THE COURTROOM DEPUTY:  Will you please pull the mike

19  up so we can get you on record?

20      (Defendant Yamatani complies)

21          THE COURTROOM DEPUTY:  Will you please state your name

22  for the record, sir?

23          DEFENDANT YAMATANI:  Kirk Yamatani.

24          THE COURTROOM DEPUTY:  Thank you, sir.

25          THE COURT:  You may be seated.
```

1        What, if anything, would you like to say?  What, if

2  anything, would you like to say?

3        DEFENDANT YAMATANI:  Thank you, your Honor.

4        I'd like to take this opportunity to first apologize

5  to the Court for my poor judgment and irresponsible actions.

6        I'm also deeply sorry for the grave embarrassment and

7  loss and emotional suffering I've caused my wife and children.

8  I've embarrassed myself in front of my community, all of my

9  peers, and my entire network of colleagues.  I've thrown away

10 14 years of a wonderful career and I'll never get it back and

11 whereas I aspired one day to leave behind a positive legacy of,

12 of work accomplishments, that is all, essentially, been

13 entirely ruined.

14       I promise I'll, I'll never again exercise such poor

15 judgment and I've learned an incredibly valuable lesson.  And

16 again, I'm just, I'm deeply sorry.

17       And thank you for the opportunity, your Honor.

18       THE COURT:  Okay.

19       Is your wife here?

20       DEFENDANT YAMATANI:  No, your Honor.  She's working.

21       THE COURT:  Why did you do this?

22       DEFENDANT YAMATANI:  I thought I had sought the

23 proper --

24       MR. LEVIN:  May I have a moment, your Honor?

25       THE COURT:  Sure.

1          MR. LEVIN:  Thank you.

2      (Pause)

3          DEFENDANT YAMATANI:  I have, I have no excuse, your

4  Honor.  I acted inappropriately.

5          THE COURT:  Why did you do it?

6          DEFENDANT YAMATANI:  I made a, a selfish,

7  irresponsible decision and a very poor judgment call.  And I

8  now understand that it was entirely the wrong thing to do.

9          THE COURT:  Tell me about your education.

10          DEFENDANT YAMATANI:  I went to American University in

11  Washington, D.C.  I got my bachelor's and my master's degree at

12  American in a major called Law and Society, which is,

13  essentially, a criminal justice study and unfortunately, now,

14  you know, I'll have to re-create some, a career, as my

15  education is, unfortunately, I've thrown that away as well,

16  your Honor.

17          THE COURT:  So you were trained in the field of

18  Criminal Justice by education?

19          DEFENDANT YAMATANI:  Yes, your Honor.

20          THE COURT:  And tell me about your job as a special

21  agent.  What did you do?

22          DEFENDANT YAMATANI:  I investigated allegations of

23  waste, fraud, and abuse for the Department of Commerce.

24          THE COURT:  So you've got experience in investigating

25  fraud and abuse?

1             DEFENDANT YAMATANI:  Yes, your Honor.

2             THE COURT:  What did you do here?

3             DEFENDANT YAMATANI:  I made poor decisions which

4    resulted in putting incorrect information on forms which

5    resulted in losses to the Government that I am responsible for.

6             THE COURT:  Am I wrong in assuming that it was your

7    job to pursue and to prosecute people who did the very things

8    you did?

9             DEFENDANT YAMATANI:  In, in part, your Honor, yes.

10   Yes.

11            THE COURT:  So according to this pre-sentence report

12   you filled out forms on at least three occasions suggesting

13   that you were entitled to thousands of dollars, tens of

14   thousands of dollars over a good period of time, a couple of

15   months.  That has a ring of complicity to it, aside from any

16   involvement with your co-defendant, but it has a ring of, of

17   insistence to it.  If I understand correctly, you've been

18   viewed to be one who has obstructed justice on this, is that,

19   is that incorrect?

20            DEFENDANT YAMATANI:  No, your Honor.

21            THE COURT:  I'm not trying to browbeat you.  I'm just

22   trying to understand a person of your experience, your

23   training, your job skills, your role as a special agent, how

24   you developed this idea of getting money that you weren't

25   entitled to and according to this, when confronted or

1    questioned you basically were fighting to the mat, I assume

2    telling a few folks that they were wrong, there's no way.

3           What caused this change of heart?

4           DEFENDANT YAMATANI:  I came to recognize that my, my

5    former belief was incorrect when given the full circumstances.

6           So I wanted to take responsibility for any actions on,

7    on my behalf.

8       (Pause)

9           THE COURT:  Mr. Yamatani, your counsel opened with a

10   very wise point.  The most difficult aspect of my job is

11   sentencing, sentencing a criminal defendant, your prima, and

12   you know, I know, the lawyer knows, everybody knows that you

13   violated trusts, confidence, oath of office, constitutional

14   oath of office.  You were a special agent.  You were living the

15   life, good life, six-figure income, family, and basically, your

16   counsel's point is that home detention does you no good, you've

17   been punished enough, it's not necessary.  He's spoken about

18   your wife and how your wife now has additional hardship due to

19   your resignation.  I don't have any paperwork, but I suspect

20   it's a resignation under fire.  You were about to be fired

21   because you got caught stealing.  You might as well have had a

22   mask because you stuck up the Government.  Might as well have

23   had a gun.  It wasn't a violent crime, but it was crime only

24   made possible due to the place of trust that you occupied.

25   This is tantamount to political corruption which this Court has

1    seen plenty of.  You were a person clothed with the uniform,

2    with the office, with the badge.

3         Your counsel has talked about the difficulty, the

4    burden that would be placed upon your kids, their needs, going

5    back and forth to camp and to school and to appointments.  He's

6    right.  And while I've asked you why -- I haven't heard you say

7    why -- what would motivate a man in that position to do the

8    things that you did and put all of that in jeopardy.  It's

9    between you and God.

10        And your counsel is right.  He says home detention may

11   make saving your home, at least the structure of your home, an

12   impossibility.  He's of the view that "probation is all that's

13   necessary," close quote.  And he got some help along the way.

14   The Government agrees that probation is a helpful thing, but

15   the Government comes to that conclusion because they want your

16   money.  They wanted your cooperation.  They have a fear of not

17   being able to collect all the monies they believe they are due.

18   That's not my concern and to the extent that the Government

19   doesn't collect what it's due, they can have a deficiency

20   judgment that they can pursue you as they could pursue anyone

21   else, whether you pay something in a timely fashion or not.

22        I'm stuck in a different place, pure and simple.

23   Punishment.  White-collar crime.  When I have defendants before

24   me that have gone into a Walmart or Sears and they filled up

25   their shopping cart with a bunch of goodies and they steal, if

1  they steal too many things or if they steal something that's

2  too much in terms of value, they go to jail.  You're no

3  different.  In fact, your conduct is worse than theirs in

4  several ways due to your position, due to your knowledge, due

5  to your means, due to your access, due to your breach of trust.

6          No, I will not impose home detention.  You will not be

7  on probation just for the sake of probation.  You're facing

8  jail time.

9          You are sentenced to the Department, Bureau of Prisons

10 for a period of eight months.  You must pay restitution in the

11 amount of $14,000, a fine in the amount of $28,000, special

12 assessment of $25.  And after you get out of jail you will be

13 under court supervision for an additional period of one year as

14 a condition of supervised release.

15         I wish you well.  That's a price.

16         Court will be in recess.

17         THE COURTROOM DEPUTY:  All rise.

18         MR. LEVIN:  Your Honor, we would ask for a self-

19 surrender date.

20         THE COURT:  No, sir.

21         MR. LEVIN:  Your Honor?

22         COURT SECURITY OFFICER:  Step back.

23         MR. LEVIN:  May I, may I be heard, your Honor?

24         COURT SECURITY OFFICER:  Step back.

25         THE COURT:  He'll be in the custody of the U. S.

1    Marshal.

2            I'm sorry.  What?

3            MR. LEVIN:  May I be heard, your Honor?

4            THE COURT:  Oh, sure.  I'm listening.

5            MR. LEVIN:  Thank you.

6            THE COURT:  Go right ahead.

7            MR. LEVIN:  Clearly, no one was expecting this, your

8    Honor, and we have simply not made any preparations.

9    Mr. Yamatani drove here today.  His wife is at work.

10   There's -- and I understand what the Court has said, but we

11   would ask for a self-surrender date, which is not at all

12   uncommon in white-collar cases, especially in this situation

13   when nobody has made any preparations for, for confinement.

14   And that's not to criticize the Court for its sentence.  It's

15   just under the terms of the plea agreement we expected

16   probation.

17           And so I would ask the Court at least consider over

18   the next few minutes a self-surrender date so that we can make

19   the, the necessary preparations.

20           THE COURT:  Your request is a reasonable one and one

21   that is not uncommon.  And you're right.  Oftentimes in this

22   courthouse, probably the majority of times in this courthouse,

23   that is what happens.  I tend to think that we treat white-

24   collar criminals too special and there are times when there is

25   a request for self-surrender, even in the street-criminal kind

1 of cases.  In both instances, I am of the view that this is the

2 day of reckoning.  Whenever a sentencing is scheduled, that is

3 the day to be prepared.

4      I don't think your request is unreasonable.  I think

5 it's very measured, but I must respectfully disagree.  No self-

6 surrenders.

7      THE COURTROOM DEPUTY:  All rise.  This Honorable Court

8 stands in recess.

9    (Proceedings concluded at 3:07 p.m.)

10

11

12

13                     CERTIFICATE

14     I, court approved transcriber, certify that the

15 foregoing is a correct transcript from the official electronic

16 sound recording of the proceedings in the above-entitled

17 matter.

18 */s/ Janice Russell*             June 25, 2013

19 Janice Russell, Transcriber         Date

20

21

22

23

24

25